Booth, J.,
delivered the opinion of the court:
The claimant, Augustus Smith, entered into a written agreement on November 18,1901, to furnish all materials and labor necessary to construct a coal-storage plant at the New York Navy Yard. The work was to be completed within 12 calendar months from the date of the contract. The coal-storage plant contemplated by the contract was to be a steel structure containing four panels or pockets so arranged that movable machinery above the same could be used in hoisting and depositing coal inside these pockets, the purpose being to coal vessels from said pockets expeditiously. At the timé of the proposals for and the letting of the contract the defendants had $60,000 available for the purpose. It was contemplated, however, and well known to both parties to the contract, that the defendants had requested an additional appropriation of $100,000 for the expressed purpose of enlarging the plant, and the claimant included within his bid, which was also included within the contract, an expressed agreement to construct additional coal pockets or panels for the sum of $7,500 each. The consideration for the construction of the four panels and other portions of the plant, as authorized by the available money on hand, was $60,000. Immediately after the claimant received notice of the acceptance of his bid he made his plans for the materials necessary to be used and took the necessary steps to execute the contract; in fact, he anticipated a $100,000 appropriation, and ordered necessary materials for, the same before the amount was appropriated by Congress.
On July 1, 1902, Congress made the necessary appropriation, and on August 12, 1902, defendants notified the claimant that he would be required to construct 13 additional coal pockets or panels. By the terms of the agreement the defendants were to construct the pier upon which the struc *251 ture was to rest. This pier was to be properly filled, leveled off, and the foundation for the superstructure fully completed before the claimant could commence his work. The pier was sufficiently advanced to permit the claimant to commence work on June 1, 1903, on which date he did commence work, completing the structure on July 25,1904, which, after proper tests, was finally accepted and paid for, except the sum of $1,375, which was deducted by the defendants because of delays chargeable to the claimants under the liquidated-damage clause of the contract. This suit is to recover said sum, together with two other small items for expense in maintaining the plant during a period of delay and for certain spare parts which the defendants claim the claimant failed to supply.
It is not difficult to glean from the findings the indisputable circumstances surrounding the making and execution of this contract. The contractor knew at the time he executed the specific writing that he might be called upon to do additional work; in fact, he so certainly anticipated this event that he' acted upon it at a time previous to the granting of any authority so to act. The Government, on the other hand, while acting in the execution of the contract strictly within its then authority, provided by express terms for a contingency which it was then urging and which, when it did happen, would be covered by the consideration stated in this single written instrument. The Government, fully aware of the uncertainties of legislation respecting appropriations of public funds, contracted for a coal-storage plant to be erected at a cost of $60,000 to be completed within a year from the date of the contract. That was the subject matter of the contract at the time of its execution, it was the limit of the Government’s authority in the premises, and exhausted the public funds available for the purposes of the contract. Until Congress appropriated an additional sum no other stipulations respecting the price or extent of the work to be done were in effect. Subsequent to the additional appropriation and after the defendants had decided to enlarge the plant, the claimant’s obligations under the contract expanded accordingly. The contingency anticipated by both parties had hap *252 pened, the time limit in the contract had no reference to the enlarged work, and the defendants never so construed it. At the time of the execution of the contract they had no authority to do more than contemplate its possibility and provide for its happening. It would be utterly absurd to impute such an intention, for the work itself was increased more than threefold and the consideration for it more than doubled.
It was a conceded physical impossibility for the defendants themselves to execute their preliminary obligations upon which the claimant’s commencing of the work absolutely depended, within or even approximately within any date mentioned in the contract. With manifest fairness the defendants admit that the pier upon which the whole structure to be erected was to rest was not ready for the commencement of work until June 1,1903. With an apparent spirit of fairness and conciliation the defendants compute the period of claimant’s delay upon a basis of compromise. Making the most of it, the computation manifests decided uncertainty, adopts arbitrary dates, and finally' concedes an allowance to the claimant of 30 days, which, under the contract they claim the right to deduct for but which deduction they remit to make certain they have in no way exceeded their rights under the contract. No better compromise could have been proposed, perhaps, nor is bad faith in anywise imputed, but it is quite difficulty to understand just why July 1, 1902, was taken as the date for the commencement of the enlarged work, when the same was not ordered to be done until August 12, 1902. It is quite true the legislation making the increased appropriation became effective on that date, but it is equally true that the claimant had no knowledge of the extent of the additional work he was to perform or the obligations he must incur. The defendants’ counsel does not insist upon this date, but commences the work on June 1, 1903, gives the claimant one year from that date for performance, and by a strange coincidence reaches the same result, i. e., if you deduct the 30 days deducted by the Bureau of Yards and Docks. (See Finding vm.) Thus the claimant is charged with 55 days’ delay and liquidated damages assessed at $25 per diem, *253 amounting in all to $1,375. Viewed then in all its aspects the undertaking involved primarily the erection of a coal-storage plant costing $60,000 to be completed within one year from the date of the contract with a distinct provision therein that any enlargement of the plant thereafter authorized should be constructed at the additional expense of $7,500 for each panel. The very words of the contract conclusively show that the work intended by the $7,500 proposition was to be work in addition, to the $60,000 plant. A fixed unit price was stated without in any way signifying the number of units to be ordered. Neither party having any knowledge at the time as to the final extent of the whole work. Each contracting party so understood the agreement and each construed the contract as giving additional time in the event of additional work.
The defendants obligated themselves to erect and prepare the site, a precedent condition upon which the commencement of the erection of the plant depended. To do this under the enlarged work required an increase in the volume of work in proportion to that required of the claimant, and in performing it they consumed nine months and nineteen days from the time it was decided to do it, viz, from August 12, 1902, to-June 1, 1903. When the defendants were ready for the claimant he was ready to begin the work, and did begin it.
It has been repeatedly held both by the Supreme Court and this court that where the building owner delays the contractor the former can not enforce a time-limit stipulation for the completion of the work, .but by his conduct waives the same, giving to the contractor a reasonable tim'e in which to complete the contract work. (District of Columbia v. Camden Iron Works, 181 U. S., 453; Ittner v. United States, 43 C. Cls., 366.)
In the case of the United Engineering Co. v. United States (47 Ib., 489), this court, in an exhaustive opinion by former Chief Justice Peelle, collated the authorities respecting the subject and treated it fully. In the case just cited the delay occasioned the contractor occurred after the contract work began, and for that reason it is insisted that case comes more nearly within McGowan v. American Tan Bark Co. (121 *254 U. S., 575), and Laidlaw-Dunn-Gordon Co. v. United States (47 C. Cls., 271). There is a vital difference in the facts of the above two cases as applied to this: In each of them there was no change in character or amount of the contract work to be performed; the subject-matter of the contract remained the same; the article to be delivered and the work incident thereto was neither increased nor diminished because of the defendants’ dilatoriness; the contract still remained capable of execution within the period of time fixed in the contract, although not within the dates. Here it is conceded by the defendants that it would have been a physical impossibility to have executed the contract work within the time fixed therefor in the original undertaking.
It is, however, contended that Specification XI was intended to cover this very contingency; that by its express terms it was to become operative in futuro, and when the extra work was ordered it served as a.self-continuing clause,keeping the contract as applied to the decreased work in full force and effect in all its various clauses and stipulations, including the one-year time limit as to the increased work.
Specification XI reads as follows:
“Continuance of work after time. — It is mutually understood and agreed that in the event of the work not being completed within the time allowed by this contract, said work shall continue and be earned on according to all the provisions of said contract, plans, and specification, unless otherwise at any time directed by the party of the second part, in writing, and said contract shall be and remain in full force and effect during the continuance and until the completion of said work, unless sooner revoked or annulled according to its terms: Provided, That neither an extension of the time beyond the date fixed for the completion of said work nor the permitting or accepting of any part of the work after said date shall be deemed to be a waiver by the party of the second part of its right to annul or terminate said contract for abandonment or failure to complete within the time specified in paragraph 9, or to impose and deduct damages as hereinafter provided.”
The specification is an unusual one. Its meaning and intent are not quite clear. Supposing, for the instant, de *255 fendants’ contention is sound, we have then a contract containing a dormant specification in nowise affecting the rights of the parties to the contract when applied to the $60,000 clause, and hence incapable of preserving the liquidated-damage clause if the extra work had never been ordered. To make it plainer, if the defendants had delayed the contractor in the construction of the $60,000 plant, as they did thereafter, and forced him to begin his work at a time when it would have been impossible to complete it within the time limit specified, no recourse could have been had under Specification XI to deduct liquidated damages, and the claimant would have been entitled to a reasonable time to complete the work, thereby leaving open and without any provision whatever, except Specification XII, for the imposition of liquidated damages in case the work provided for was not completed in time. It serves to give the contract an unusual twofold meaning by extending to the contractor 12 months for the completion of the $60,000 plant and at the same time limiting him to exactly the same period to complete a work more than three times as great and involving more than twice the consideration. It would seem more in accord with reasonableness to say that the contract meant that the contractor would erect and complete the $60,000 structure within a year; if you order 1, 2, 12, or 13 additional panels I will construct them at $7,500 each, with no mention of the time in which to do it. You have authority only to contract for the $60,000 plant; you have expressly so stated in the following language:
“ Item 2. The bureau intends to recommend an additional appropriation being made by Congress of $100,000 for an extension to the plant bid on under item 1, which, if granted, will become available not later than July 1,1902, and invites proposals upon this extension to cost not more than $100,000. Contract can now be entered into only to the amount of $60,000, and bidders should make their supplemental proposals contingent upon the additional appropriation of $100,000 being made. While the award will be made for not exceeding $60,000, the decision will be influenced by the design of the $160,000 plant. The $60,000 plant shall be complete in itself so far as this limited amount will permit, *256 and the supplemental proposal under this item shall be for' an extension to be undertaken and carried out in such way as to make the entire plant one compact, complete whole. A decision will be made upon the contingent acceptance of item 2, or its rejection, at the time of the award for the plant to be constructed under the appropriation available.”
The supplemental proposal invited by the above memorandum referring to the possible extension of the plant depended for validity upon subsequent events; the claimant, by the terms of the agreement, offered to construct the extension at so much per each panel. To that offer he was bound, but the defendants were not obligated to accept it; the mutual obligations of the contracting parties extended until August, 1902, to the $60,000 plant only, with reference to it as an authorized undertaking, and to it alone did the contract then apply. To make it applicable to'the extension, required- subsequent legislation and subsequent action upon the part of the United States, and while nothing was said as to additional time for completion of the work, both parties understood and both parties so construed the contract to intend its allowance. There could be no provision respecting it, for the defendants had not then determined its extent. They didn’t know whether they would order 12, 13, or more panels, and had no possible way of fixing a time limit for the construction of a panel. Government contracts of this character are not at all unusual; necessary governmental work is not infrequently inaugurated with a view to its enlargement and extension by subsequent appropriations not at the time available to carry forward the contemplated project. In .all such instances the same precautions are given, and the same limitations inserted in both contract and memorandum advising the contractors as to the limit of the Government’s present authority to contract. Provision is sometimes expressly made for future contingencies, wherein the parties are made to understand by plain and unambiguous language that the defendants reserve the privilege to change, enlarge, or revise the whole work, providing in detail for all such changes, including proper extensions of time.
*257 Specification XI was limited to tbe contract for tbe $60,000 plant. If it bad been intended to embrace tbe enlarged work it would bave been a very simple matter to have so stated. Apt language would bave been employed, giving to tbe defendants an express right to fix another date for tbe commencement of tbe work and another period of time for its completion. Nothing could be more persuasive if not conclusive than the action of the defendants themselves, where, as shown in finding vm, they conceded 22 months’ time to the contractor, a period nowhere mentioned in the written instrument itself. Taking the findings as a whole, considering the action of the parties to the contract, it is fully justifiable to state that the time limit mentioned in the contract was not only impliedly waived by the delayed action of the defendants, but was expressly set aside by their own written reports. The engineer in charge of the work for the United States advised that it be done and commended the claimant for his celerity of performance.
Was the work completed within a reasonable time? From the record before us there can be no doubt of this fact. The claimant was diligent; work was prosecuted at times under the stress of labor disturbances when practically all other work in that locality was suspended. Labor and material were procured with reasonable dispatch. In fairness to both parties, it may be properly observed that, subsequent to June 1, 1903, the work progressed with mutual .advantage and was completed as soon as it could reasonably' have been done. There is no room for complaint for either party after the work started until its completion. The undertaking as finally consummated was a work of great magnitude, requiring large quantities of material and much machinery. Taking the conceded date of completion as the proper one, we find the claimant meeting all the requirements of the enlarged contract in 1 year and 54 days from the time the Government was ready for him to commence work.
The other items of the claim are without merit.
Judgment is .awarded the claimant for $1,375. It is so ordered.